UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– v.–

SERVINO SIMMON,

Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  7/28/15
```

**MEMORANDUM
OPINION & ORDER**

13 Cr. 855 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Servino Simmon – who pleaded guilty to a felon-in-possession charge

under 18 U.S.C. § 922(g) – is scheduled for sentencing on July 29, 2015. This opinion addresses

the proper application of the Sentencing Guidelines to this case. For the reasons stated below,

this Court concludes that the applicable Guidelines range is 100 to 125 months' imprisonment.

## BACKGROUND

### I.    CHARGES AND TRIAL

The Indictment charges Simmon with Hobbs Act robbery, in violation of 18

U.S.C. § 1951; using a firearm in connection with a crime of violence, in violation of 18 U.S.C.

§ 924(c); and felon-in-possession, in violation of 18 U.S.C. § 922(g). See Indictment (Dkt. No.

6).

The Government alleged that Simmon had attempted to rob a livery car driver at

about 5:00 a.m. on October 19, 2013, at East 137th Street and St. Ann's Avenue in the South

Bronx. (Cmplt. (Dkt. No. 1) ¶ 5a) The case proceeded to trial on June 2, 2014. This Court

bifurcated the Hobbs Act robbery and Section 924(c) charges from the felon-in-possession count.

(Dkt. No. 18 at 7) After several hours of deliberation, the jury returned a verdict acquitting the

Defendant on the Hobbs Act robbery and Section 924(c) counts. (Trial Tr. (Dkt. No. 62) at 510)

After accepting the verdict on June 5, 2014, this Court informed the jury – for the first time – that there would be a second phase of the trial, in which the jury would hear evidence and argument concerning, and render a verdict on, the felon-in-possession count. (Id. at 511-12) The parties then gave opening statements concerning this charge, and additional evidence was received. (Id. at 512-21) After summations, this Court instructed the jury as to the felon-in-possession count and the jury began its deliberations on that count. (Id. at 526-31)

At the end of the day, the jury sent out a note saying that it could not agree on a unanimous decision as to the felon-in-possession count. (Id. at 532-33) This Court sent the jurors home and they resumed deliberations at 11:00 a.m. the next day. (Id. at 533-38) The Court gave the jury an Allen charge in the mid-afternoon after another deadlock note. (Trial Tr. (Dkt. No. 64) at 543-46) At about 5:00 p.m., the jury sent out a note stating that the jury remained deadlocked. At that point, this Court declared a mistrial on Count Three, the felon-in-possession count. (Id. at 547-48)

## II.    GUILTY PLEA AND PLEA AGREEMENT

On August 8, 2014, Defendant pleaded guilty to Count Three – the felon-in-possession count – before Magistrate Judge Netburn. (Plea Tr. (Dkt. No. 71)) This Court accepted the plea in an August 11, 2014 order. (Dkt. No. 70)

Defendant pleaded guilty pursuant to a plea agreement that contains a number of stipulations regarding the application of the Sentencing Guidelines, both as to offense level and as to criminal history. As to Defendant's offense level, the plea agreement stipulates that, pursuant to U.S.S.G. § 2K2.1(a)(4)(A), the base offense level is 20, "because the defendant committed the instant offense subsequent to sustaining a felony conviction for a crime of violence, to wit, a conviction on or about April 15, 2005 in New York County Supreme Court of

2

Robbery in the Second Degree." (Plea Agmt. (Dkt. No. 95) at 2)  The plea agreement also

stipulates that, assuming Defendant clearly demonstrates acceptance of responsibility, a two-

level reduction will be warranted pursuant to U.S.S.G. § 3E1.1(a).  (Id.)  The agreement also

states that, assuming Defendant accepts responsibility, "the Government will move at sentencing

for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant

gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to

avoid preparing for trial and permitting the Court to allocate its resources efficiently." (Id.)  The

plea agreement thus arrives at a total offense level of 17.  (Id.)

As to Defendant's criminal history, the plea agreement stipulates that Defendant

has five criminal history points, which correlates with Criminal History Category III.  (Id. at 2-3)

The plea agreement recites that Defendant was convicted on April 15, 2005, in New York

County Supreme Court of two counts of Robbery in the Second Degree, and was sentenced to six

years' imprisonment for both offenses.  (Id. at 2)  This sentence results in three criminal history

points pursuant to U.S.S.G. §§ 4A1.1(a) and 4A1.2(a)(2).  (Id.)  Because Defendant committed

the instant offense while under a term of post-release supervision in connection with the 2005

robbery offenses, the plea agreement stipulates that two points are added pursuant to U.S.S.G.

§ 4A1.1(d).  (Id.)  The plea agreement notes that – although Defendant testified during his April

2005 trial on second-degree robbery charges that he "robbed a delivery man at knife point on

January 8, 1999" – "[n]o conviction for the 1999 robbery offense appears in the defendant's

published criminal history."[1]  (Id. at 2 n.1)  Accordingly, the plea agreement does not provide for

criminal history points associated with the 1999 robbery.  (Id. at 2)

---

[1] As discussed below, the 1999 robbery does not appear on Defendant's rap sheet because he
was adjudicated a youthful offender.

Based on these stipulations, the plea agreement provides for a Guidelines range of

30 to 37 months' imprisonment. (Id. at 3)

## III.   THE COURT'S SEPTEMBER 15, 2014 ORDER

In preparing for sentencing, the Court became concerned that the parties'

stipulations in the plea agreement did not address the full scope of Defendant's conduct in this

case or his criminal record. Because these matters are relevant to the proper application of the

Sentencing Guidelines, the Court issued an order on September 15, 2014, directing the parties to

address the following issues in their sentencing submissions:

1. whether additional criminal history points should be assessed under U.S.S.G. § 4A1.1(a), based on the Defendant's conviction for Robbery in the First Degree on June 7, 2000, and his subsequent re-sentencing to one to three years' imprisonment on December 19, 2001. In this regard, the parties will address application of U.S.S.G. §§ 4A1.1(a) & cmt. n.1, 4A1.2(a)(1), 4A1.2(b)(1), 4A1.2(d), 4A1.2(e)(1), and 4A1.2(k) & cmt. n.11, as well as the Second Circuit's holdings in United States v. Cuello, 357 F.3d 162, 168-69 (2d Cir. 2004) and United States v. Driskell, 277 F.3d 150, 156-57 (2d Cir. 2002);

2. whether Defendant committed any part of the instant offense after sustaining at least two felony convictions for a crime of violence under U.S.S.G. § 2K2.1(a)(2) & cmt. nn.1, 10;

3. whether the firearm Defendant possessed on October 19, 2013, was stolen for purposes of U.S.S.G. § 2K2.1(b)(4)(A) & cmt. n.8;

4. whether Defendant used or possessed a firearm in connection with another felony offense under U.S.S.G. § 2K2.1(b)(6)(B) & cmt. n.14. The parties will address whether the evidence adduced at trial demonstrated that Defendant committed the crimes of Coercion in the First Degree – in violation of N.Y. Penal Law § 135.65 – when he allegedly demanded that Mr. Kromah drive him to 137th Street and St. Ann's Avenue (see Trial Tr. (Dkt. No. 46) at 33-34), or Reckless Endangerment in the First Degree – in violation of N.Y. Penal Law § 120.25 – when he allegedly struggled with Officer Azcona over a loaded firearm and attempted to pull the trigger (see Trial Tr. (Dkt. No. 48) at 162-63); and

5. whether Defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer under U.S.S.G. § 3C1.2 & cmt. nn.1-4.

(Dkt. No. 73 at 1-2)  The Court also directed the Probation Department "to consider the[]
Guidelines provisions [cited by the Court] in preparing the Pre-Sentence Report[.]"  (Id. at 2)

## IV.    PRE-SENTENCE INVESTIGATION REPORT

The Probation Department issued a Pre-Sentence Investigation Report ("PSR") on
October 29, 2014.  The Guidelines range calculated in the PSR – 57 to 71 months' imprisonment
– is significantly higher than the 30-37 month range reflected in the plea agreement.  See PSR ¶
66.  The higher range set forth in the PSR reflects the Probation Department's determination that
Defendant's June 7, 2000 conviction for First Degree Robbery should be considered in
calculating the Defendant's offense level and his criminal history category.  With respect to the
2000 conviction, the PSR states that Defendant was arrested on January 8, 1999 – at age 16 – and
was convicted of First Degree Robbery in New York County Supreme Court.  (Id. ¶ 33)  The
PSR also states that (1) on June 7, 2000, Defendant was adjudicated a youthful offender and
received a sentence of five years' probation; (2) on December 19, 2001, he was re-sentenced to
one to three years' imprisonment; (3) on October 10, 2002, he was paroled; (4) on March 10,
2004, his parole was revoked due to violations and he was admitted to Ulster Correctional
Facility; and (5) on May 18, 2004, he was again released to parole.  (Id.)

The PSR calculates a base offense level of 24, because Defendant committed the
instant offense "subsequent to sustaining at least two felony convictions of. . . . a crime of
violence" – i.e., the 2000 and 2005 robbery convictions – pursuant to U.S.S.G. § 2K2.1(a)(2).
(Id. ¶ 22)  The PSR grants a three-level reduction for acceptance of responsibility, pursuant to
U.S.S.G. §§ 3E1.1(a) and (b), resulting in a total offense level of 21.  (Id. ¶¶ 29-31)

As to Defendant's criminal history, the PSR imposes three points – pursuant to
U.S.S.G. §§ 4A1.1(a), 4A1.2(d)(1), and 4A1.2(e)(1) – for Defendant's 2000 first-degree robbery

conviction. (Id. ¶ 33) It also adds three points for Defendant's 2005 second-degree robbery

conviction (id. ¶ 35), and two points because Defendant committed the instant offense while

under a criminal justice sentence for the 2005 robbery conviction. (Id. ¶ 38) Accordingly, the

PSR calculates a criminal history score of eight, which correlates with Criminal History

Category IV. (Id. ¶ 39)

                   Based on these calculations, the PSR concludes that the applicable Guidelines

range is 57 to 71 months' imprisonment. (Id. ¶ 66)

## V.    NOVEMBER 10, 2014 CONFERENCE

                   Sentencing was originally scheduled for November 10, 2014. See Dkt. No. 69.

On October 27, 2014, however, Defendant filed a sentencing brief containing a motion to

withdraw his guilty plea, pursuant to Rule 11(d) of the Federal Rules of Criminal Procedure. See

Def. Sent. Br. (Dkt. No. 96). This Court denied Defendant's motion in a bench ruling on

November 10, 2014.[2] See Nov. 10, 2014 Tr. (Dkt. No. 84) at 8-20. The Court did not proceed to

sentencing at that time, however.

---

[2] In a November 17, 2014 letter, Defendant renews his argument that he should be permitted to
withdraw his guilty plea. (Def. Second. Supp. Sent. Ltr. (Dkt. No. 81) at 19-22) Defendant
contends that "[w]here the plea follows a trial and a court is at least seriously contemplating
enhancements based on the trial evidence and the extensive record, but which are not contained
in the parties' written plea agreement, this information should be shared with the defendant so
that he can make a truly knowing and voluntary choice about whether to waive fundamental
rights." (Id. at 20 (citation omitted)) Defendant further argues that "[d]efendants who have
wildly inaccurate information relating to the Guidelines at the time of their plea, and who would
have made a different decision with correct information, should be permitted to withdraw their
pleas." (Id. at 21 (citation omitted))

As set forth in the Court's November 10, 2014 bench ruling, however, Defendant was
specifically warned at the time of his guilty plea – both in the plea agreement itself and during
the Rule 11 allocution – that the Court was not bound by the parties' plea agreement and that the
Court's Sentencing Guidelines calculations might differ from those set forth in the plea
agreement. (Nov. 10, 2014 Conf. Tr. (Dkt. No. 84) at 4-6; Plea Agmt. (Dkt. No. 95) at 3-4) The
Defendant was also specifically warned that he would not be permitted to withdraw his guilty
plea in the event that the Court's Guidelines calculations differed from those adopted by the

Because neither Defendant nor the Government had properly addressed the issues set forth in the September 15, 2014 Order, the Court directed the parties to submit briefs addressing these issues. (Nov. 10, 2014 Tr. (Dkt. No. 84) at 20)  The Court also directed the Government to (1) "collect all available information concerning the issue of whether the firearm possessed by the defendant was stolen"; and (2) "respond to defendant's arguments concerning the appropriate treatment of defendant's June 2000 youthful offender [adjudication] under the Sentencing Guidelines." (Id.)  Both sides were instructed "to address why defendant was resentenced to one to three years of imprisonment on December 19, 2001 . . . at a time when he was over 18 years old, and how this fact affects the guidelines calculation." (Id.)

The parties filed supplemental sentencing submissions on November 17, 2014. (Dkt. Nos. 81-83)  As to Defendant's 2000 youthful offender adjudication, the Government stated that it "continue[d] to investigate" the circumstances of that conviction – pursuant to an unsealing order – and "hope[d] to provide additional information to the Court shortly." (Dkt.

---

parties. (Nov. 10, 2014 Conf. Tr. (Dkt. No. 84) at 5-6; Plea Agmt. (Dkt. No. 95) at 4) Moreover, although Defendant argues that he had "wildly inaccurate information relating to the Guidelines at the time of [his] plea" (see Def. Second Supp. Sent. Ltr. (Dkt. No. 81) at 21), nothing could be further from the truth. All of the facts necessary to accurately calculate the Defendant's Guidelines range were known to the Defendant at the time of his guilty plea.

Defendant's argument that a court is required to advise a defendant of the applicable Guidelines range at the time of a guilty plea (see id. at 19-22) finds no support in the case law. Such a standard would be unworkable, because facts often emerge during the pre-sentence investigation that affect a defendant's Guidelines range. United States v. Andrades, 169 F.3d 131, 134 (2d Cir. 1999) ("While the Sentencing Guidelines certainly are a relevant consideration for defendants entering a plea of guilty, the district court at the time of the plea allocution frequently has too little information available to provide defendant with an accurate sentencing range."). In any event, as this Court stated in denying Defendant's motion to withdraw his guilty plea, "'there is no requirement in Rule 11 itself that defendants be advised of their potential punishments pursuant to the Sentencing Guidelines rather than the criminal statute[.]'" (Nov. 10, 2014 Tr. (Dkt. No. 84) at 12-13 (quoting Andrades, 169 F.3d at 134). Accordingly, to the extent that Defendant renews his motion to withdraw his guilty plea, that motion is denied.

7

No. 82 at 2)  The Government completed its submissions concerning this issue on April 24, 2015.  (Dkt. Nos. 87, 90, 97, 98)

## LEGAL STANDARD

"[B]ecause district courts [are] statutorily obliged under 18 U.S.C. § 3553(a) to 'consider' the [Sentencing] Guidelines, they [are] statutorily obliged to calculate a Guidelines range [before sentencing a defendant]." United States v. Salazar, 489 F.3d 555, 557 (2d Cir. 2007) (citing United States v. Crosby, 397 F.3d 103, 111-12 (2d Cir. 2005)).  "[T]he statutory requirement to determine a Guidelines range . . . necessarily means that facts relevant to sentencing must be found by a preponderance of the evidence." Id.  Accordingly, proof by a "'preponderance of the evidence' is the generally applicable standard for a sentencing judge to employ when deciding the weight and effect to accord relevant, uncharged conduct at sentencing." United States v. Cordoba-Murgas, 233 F.3d 704, 708 (2d Cir. 2000) (citations omitted); see also U.S.S.G. § 6A1.3 cmt. ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

## DISCUSSION

As discussed below, this Court finds that the following Sentencing Guidelines enhancements – which are not addressed in the parties' plea agreement apply:  (1) a four-level increase to Defendant's base offense level under Section 2K2.1(a)(2) based on his 2000 robbery conviction; (2) a two-level enhancement under Section 2K2.1(b)(4)(A) because the firearm in the instant offense was stolen; (3) a four-level enhancement under Section 2K2.1(b)(6)(B) because Defendant used a firearm in connection with the felony offense of coercion in the first degree, in

violation of New York Penal Law § 135.65; and (4) an additional three criminal history points

under Section 4A1.1(a) based on Defendant's 2000 robbery conviction.

## I.   DEFENDANT'S YOUTHFUL OFFENDER CONVICTION

In calculating Defendant's criminal history category, the PSR adds three points

based on his 2000 conviction for first-degree robbery in New York Supreme Court, even though

the Defendant – 16 years old at the time of the offense – was adjudicated a youthful offender

after his guilty plea.[3] (PSR ¶ 33; New York State rap sheet (Dkt. No. 94) at 6)  Similarly, the

---

[3] The Second Circuit has explained New York's youthful offender procedure as follows: "In
New York, an individual between the ages of sixteen and nineteen who is charged with a
criminal offense (excluding certain enumerated felonies) and fulfills other specified conditions
(including having not been previously convicted and sentenced for a felony nor previously
adjudicated a youthful offender) is deemed an 'eligible youth' [for purposes of determining
eligibility for youthful offender treatment]." United States v. Driskell, 277 F.3d 150, 152 (2d
Cir. 2002) (citing N.Y. Crim. Proc. Law § 720.10(1)-(2) (McKinney 1995)). "Such an 'eligible
youth' is tried 'as any criminal defendant would be.'" Id. (quoting Capital Newspapers Div. of
the Hearst Corp. v. Moynihan, 71 N.Y.2d 263, 268 (1988)). "'Upon conviction of an eligible
youth, the court must order a pre-sentence investigation of the defendant' and after receipt of the
investigation report, 'the court must determine [during sentencing] whether or not the eligible
youth is a youthful offender' while considering certain enumerated factors." Id. (quoting N.Y.
Crim. Proc. Law § 720.20(1)) (footnote omitted). "'Upon determining that an eligible youth is a
youthful offender, the court must direct that the conviction be deemed vacated and replaced by a
youthful offender finding' and sentence the defendant pursuant to § 60.02 of New York's penal
law." Id. at 152-53 (quoting N.Y. Crim. Proc. Law § 720.20(3)) (footnotes omitted). "The
youthful offender finding and resulting sentence together constitute a 'youthful offender
adjudication.'" Id. at 153 (citing N.Y. Crim. Proc. Law § 720.10(6)). "If adjudicated as a
youthful offender, that adjudication is not a judgment of conviction for a crime or any other
offense, and does not operate as a disqualification of any person so adjudged to hold public
office or public employment or to receive any license granted by public authority but shall be
deemed a conviction only for the purposes of transfer of supervision and custody." Id. (citing
N.Y. Crim. Proc. Law § 720.35(1)).

However, for purposes of applying U.S.S.G. § 4A1.2(d) – the Guidelines provision applicable to
"Offenses Committed Prior to Age Eighteen" – "the district court [is required to] determine
whether the defendant was 'convicted' and 'received a sentence of imprisonment exceeding one
year and one month,' . . . not whether the state court has ultimately reduced its disposition to
judgment or to some other term." Id. at 156 (quoting U.S.S.G. § 4A1.2(d)(1)). Moreover, "a
court may consider a defendant's eligible past conviction [for Sentencing Guidelines purposes],
even when that conviction has been vacated and deemed a youthful offender adjudication under

9

Probation Department relied on the 2000 robbery conviction in concluding that the Defendant committed the instant offense after sustaining at least two violent felony convictions. (PSR ¶ 22) As a result, the Probation Department determined that Defendant's base offense level is 24 pursuant to U.S.S.G. § 2K2.1(a)(2). (Id.) Defendant argues, however, that the 2000 robbery conviction "should not result in criminal history points or increase his offense level" because Defendant "was not convicted 'as an adult' within the meaning of U.S.S.G. § 4A1.2(d)(1)." (Def. Second Supp. Sent. Ltr. (Dkt. No. 81) at 3)

According to the PSR, Defendant was arrested and charged with robbery on January 8, 1999 – at age 16 – and on June 7, 2000 – at age 17 – he was convicted of first-degree robbery in New York County Supreme Court. (PSR ¶ 33) Defendant was adjudicated a youthful offender at that time and received a sentence of five years' probation. (Id.) The PSR also states that, on December 19, 2001 – when Defendant was 19 years old – he was re-sentenced to one to three years' imprisonment. (Id.) Court records indicate that Defendant was re-sentenced because of multiple probation violations related to four arrests for, inter alia, criminal trespass, criminal mischief, and possession of marijuana.[4] See Apr. 24, 2015 Def. Ltr. (Dkt. No. 98), Ex. 6 at 1-3. Defendant served his one to three year sentence at Ulster Correctional Facility. See New York State rap sheet (Dkt. No. 94) at 7. Defendant was paroled on October 10, 2002, but his parole was revoked on March 10, 2004, and he was once again incarcerated at Ulster

---

New York law, in those situations where . . . the defendant although under age eighteen was tried in an adult court, convicted as an adult, and received and served a sentence exceeding one year and one month in an adult prison." Id. at 154.

[4] New York City Department of Probation records indicate that Defendant was arrested six times between January 2001 and October 2001: three times for criminal possession of a controlled substance; once for assault; once for criminal trespass; and once for criminal mischief. (Apr. 24, 2015 Def. Ltr. (Dkt. No. 98), Ex. 12)

10

Correctional Facility. (PSR ¶ 33) Defendant was paroled again on May 18, 2004, but violated parole again by committing the 2005 second-degree robbery. (Id. ¶¶ 33, 35)

Section 4A1.1 of the Guidelines provides that, in calculating a defendant's criminal history category, three points must be added "for each prior sentence of imprisonment exceeding one year and one month." U.S.S.G. § 4A1.1(a). "The term 'sentence of imprisonment' means a sentence of incarceration and refers to the maximum sentence imposed." U.S.S.G. § 4A1.2(b) & cmt. n.2. "In the case of a prior revocation of probation, . . . the original term of imprisonment [is added] to any term of imprisonment imposed upon revocation. The resulting total is used to compute the criminal history points for §4A1.1(a). . . ." U.S.S.G. § 4A1.2(k). A court's determination of this issue also has implications for a defendant's base offense level under Section 2K2.1(a), because that provision takes into account a defendant's prior felony convictions. U.S.S.G.§ 2K2.1(a). For purposes of Section 2K2.1(a), a "prior felony conviction" is defined as a "felony conviction[] that receive[s] criminal history points under § 4A1.1(a), (b), or (c)." U.S.S.G. § 2K2.1 cmt n.10.

Here, Defendant was sentenced in 2001 to a term of imprisonment of one to three years due to his probation violations. See PSR ¶ 33; Apr. 24, 2015 Def. Ltr. (Dkt. No. 98), Exs. 2, 3, 6. When the "maximum sentence imposed" based on the probation revocation – 3 years' imprisonment – is added to the original term of imprisonment for the 2000 conviction – zero months' imprisonment – Defendant's "sentence of imprisonment" is 3 years. His "sentence of imprisonment" for the 2000 robbery conviction thus "exceed[s] one year and one month" for purposes of U.S.S.G. §§ 4A1.1(a) and 2K2.1(a).

Defendant argues, however, that the 2000 robbery conviction should not result in criminal history points – or an increase in his base offense level – because he was adjudicated a

11

youthful offender in 2000. (Def. Second. Supp. Ltr. (Dkt. No. 81) at 3) Under Section 4A1.1, a

"sentence imposed for an offense committed prior to the defendant's eighteenth birthday is

counted . . . only if it resulted from an adult conviction." U.S.S.G. § 4A1.1 cmt. n.1.

      The Second Circuit has instructed that

> "a district court, in calculating a defendant's criminal history pursuant to
> [U.S.S.G. §§ 4A1.1 and 4A1.2(d)], should look to the substance of the past
> conviction rather than the statutory term affixed to it by a state court.
> Accordingly, a court may consider a defendant's eligible past conviction, even
> when that conviction has been vacated and deemed a youthful offender
> adjudication under New York law, in those situations where . . . the defendant
> although under age eighteen was tried in an adult court, convicted as an adult, and
> received and served a sentence exceeding one year and one month in an adult
> prison."

United States v. Cuello, 357 F.3d 162, 167 (2d Cir. 2004) (quoting United States v. Driskell, 277

F.3d 150, 154 (2d Cir. 2002)). Similarly, "determining whether a New York youthful offender

adjudication is 'classified as an adult conviction under the laws of' New York for the purpose of

U.S.S.G. § 2K2.1 requires 'district court[s] to examine the substance of the prior conviction at

issue; to focus on the nature of the proceedings, the sentences received, and the actual time

served.'" Id. at 168-69 (quoting Driskell, 277 F.3d at 157) (internal quotation marks and citation

omitted).

      Here, Defendant was charged and convicted in New York Supreme Court, an

adult court. See Apr. 24, 2015 Def. Ltr. (Dkt. No. 98), Exs. 1, 4. He received an initial sentence

of 5 years' probation for that conviction, and then was re-sentenced on December 19, 2001, in

New York Supreme Court to one to three years' imprisonment after violating the terms of his

probation. Defendant served the one to three year sentence in Ulster Correctional Facility, an

adult facility. Accordingly, because Defendant was convicted in an adult court in 2000 of first-

degree robbery, ultimately received a sentence exceeding one year and one month, and served

that sentence in an adult facility, this Court will treat Defendant's 2000 youthful offender adjudication as an "adult conviction" for purposes of U.S.S.G. §§ 4A1.2(d)(1) and 2K2.1.[5]

## II.     POSSESSION OF A STOLEN FIREARM

Section 2K2.1(b)(4)(A) provides that the base offense level for a defendant convicted under 18 U.S.C. § 922(g)(1) is increased by two levels where any firearm used in the offense was stolen. U.S.S.G. § 2K2.1(b)(4)(A). Police records establish that the firearm Defendant possessed at the time of his arrest for the instant offense was stolen. See Nov. 11, 2014 Gov't Ltr. (Dkt. No. 82) at 4-13 (Chesapeake Police Department records stating that, on August 1, 2013, a victim reported the theft of a .380 caliber black Cobra Nighthawk pistol from her home, and later identified the serial number as "CPO 73863"); at 14 (ATF trace report stating that a Cobra pistol with the serial number CP073863 was recovered from Servino Simmon on October 19, 2013); at 16 (NYPD voucher for the firearm, dated October 19, 2013, stating that a firearm with the serial number CP073863 was stolen); at 17 (NYPD report stating that a ".380 firearm" with the serial number CP073863 was recovered from the lap of Servino Simmon at the time of his arrest on October 19, 2013).

Defendant argues that "it is unclear how [Officer] Azcona[, the officer who arrested Defendant,] would have been able to learn or know that the gun was stolen before making the [arrest] reports," and that "Defendant has no personal knowledge as to whether the gun was stolen." (Def. Second Supp. Sent. Ltr. (Dkt. No. 81) at 16 n.7) Defendant argues that,

---

[5] Although Defendant was paroled before serving one year and one month, "[c]riminal history points are based on the sentence actually pronounced, not the length of time actually served." United States v. Pitts, No. 12 Civ. 1081 (EBB), 2014 WL 111824, at *2 (D. Conn. Jan 10, 2014) (citing U.S.S.G. § 4A1.2 cmt. n.2); see also id. ("The fact that execution of [the defendant's] sentence was suspended is irrelevant in determining whether the sentence imposed under § 4A1.1 was an adult sentence.") (citing U.S.S.G. § 4A1.2 cmt. n.2).

13

"[b]ased on the record, the Court should not apply an enhancement under U.S.S.G.

§ 2K2.1(b)(4)(A)." (Id.)

    Defendant's argument ignores the Application Note to Section 2K2.1, which

states that the two-level enhancement for a stolen firearm "applies regardless of whether the

defendant knew or had reason to believe that the firearm was stolen. . . ." U.S.S.G. § 2K2.1 cmt.

n.8(B). Whether Officer Azcona knew at the time of the arrest that the firearm was stolen is

likewise irrelevant. Because the record clearly establishes that Defendant possessed a stolen

firearm when he was arrested for the instant offense, this Court will apply a two-level

enhancement to Defendant's base offense level pursuant to U.S.S.G. § 2K2.1(b)(4)(A).

## III. USE OR POSSESSION OF A FIREARM IN
  CONNECTION WITH ANOTHER FELONY OFFENSE

    Section 2K2.1(b)(6)(B) provides for a four-level enhancement if the defendant

"used or possessed any firearm or ammunition in connection with another felony offense."

U.S.S.G. § 2K2.1(b)(6)(B). For purposes of this subsection, "another felony offense" means

"any federal, state, or local offense, other than the explosive or firearms possession or trafficking

offense, punishable by imprisonment for a term exceeding one year, regardless of whether a

criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1 cmt. n.14(C). This

Court asked the parties to address, inter alia,

> whether the evidence adduced at trial demonstrated that Defendant committed the
> crime[] of Coercion in the First Degree – in violation of N.Y. Penal
> Law § 135.65 – when he allegedly demanded that Mr. Kromah[, the driver of the
> livery car in which Defendant was riding on the night of his arrest,] drive him to
> 137th Street and St. Ann's Avenue (see Trial Tr. (Dkt. No. 46) at 33-34). . . .

(Dkt. No. 73 at 2)

    At trial, Laye Kromah testified that, between 4:00 a.m. and 5:00 a.m. on October

19, 2013, Defendant hailed his livery cab on the corner of Third Avenue and 165th Street in the

14

Bronx and got into the back seat.[6]  (Trial Tr. (Dkt. No. 46) at 31-32)  Defendant directed Kromah

to drive to 139th Street and Third Avenue.  (Id. at 33)  Kromah testified that an altercation

ensued at this location:

> Q.  When you got to 139th Street and Third Avenue, what happened then?
>
> A.  I said, I'm at your destination.
>
> Q.  And what, if anything, did he say in response?
>
> A.  He said, we should go to 137th and St. Anns.
>
> Q.  Can you describe his tone of voice when he said that?
>
> A.  He was now loud.
>
> Q.  Can you describe a little more?  What else apart from loud?
>
> A.  He was screaming at me, saying that I should go forcefully, that I should go to 137th and St. Anns.
>
> Q.  How did you react to him saying what he said so forcefully?
>
> A.  I said I was not going there, and he demanded I should go there forcefully.
>
> Q.  And why did you say you wouldn't go to that other location?
>
> A.  The way he said it, the way he demanded me to go there forcefully, he made me not to agree to go there.
>
> Q.  And what, if anything – what happened next?
>
> A.  He said if I don't go there, he going to shoot me with gun.
>
> . . . .
>
> Q.  . . . did he show you anything at that point in time?
>
> A.  He point the gun at me.

---

[6]  Kromah is from Liberia and arrived in the United States in 2008.  His native language is Mandingo, and – although he occasionally spoke in English – most of his testimony was given through a Mandingo interpreter.  See Trial Tr. (Dkt. No. 46) at 20-22.

(Id. at 33-34)

Under New York law, a person is guilty of Coercion in the First Degree when he "compels or induces a person to engage in conduct which the latter has a legal right to abstain from engaging in, or to abstain from engaging in conduct in which he or she has a legal right to engage," by "instilling in the victim a fear that he . . . will cause physical injury to [the] person or cause damage to property." N.Y. Penal Law §§ 135.60, 135.65(1). Coercion in the First Degree is a felony. N.Y. Penal Law § 135.65.

Defendant argues that Kromah was not a credible witness, and thus there is no reliable factual basis on which to find that Defendant committed Coercion. (Def. Second Supp. Sent. Ltr. (Dkt. No. 81) at 8) Defendant contends that:

(1)     Kromah lacks the ability to perceive and recall events accurately, given that he is uneducated and does not speak English;

(2)     even with the aid of an interpreter, Kromah struggled to understand questions and simple concepts;

(3)     his memory was generally poor;

(4)     he could not communicate effectively with his passengers;

(5)     Kromah had been working for 14 hours prior to the incident with Defendant;

(6)     Kromah has significant problems with his vision;

(7)     Kromah was not truthful about his cognitive and perceptive limitations;

(8)     Kromah's account of seeing a gun and "coercion" by Defendant is "garbled," and it is "not at all clear that there was an intentional threat or demand that Kromah drive to a particular location or face injury";

(9)     Kromah never told police that Defendant "coerced" him, and the District Attorney's Office never brought this charge against Defendant;

(10)    Kromah gave different accounts of where Defendant threatened him;

(11)    Kromah's behavior does not indicate that he was threatened at gunpoint, given that he did not try to exit his vehicle and did not use the emergency button connected to his camera system;

(12)    Kromah had a motive to say that Defendant did something wrong, because Kromah repeatedly punched Defendant after the police arrived on the scene;

16

(13) Kromah failed to assist the police in obtaining a video recording from the camera inside his car;

(14) Kromah has several New York City Taxi and Limousine Commission ("TLC") violations and traffic citations;

(15) Kromah's testimony contradicts that of Officer Azcona, who testified that he heard two loud voices yelling and arguing loudly in the cab at 137th Street and St. Ann's Avenue; and

(16) the "presence of an apparently operational recording device . . . make[s] it unlikely that someone would attempt to commit a violent crime in the cab."

(Id. at 8-11)

Having observed Kromah at trial, this Court finds that his testimony was entirely credible on the issue of whether Defendant threatened him with a firearm in order to induce him to drive Defendant to a second location. With respect to Kromah's English language and communication skills, Kromah testified, in part, in English. See, e.g., Trial Tr. (Dkt. No. 46) at 20, 35-36, 38. Moreover, Kromah testified that he speaks English with his passengers; that he is "able to discuss locations and prices in English"; and that although he sometimes misunderstands their directions, he then "go[es] to where they are talking about." (Id. at 22-23; Trial Tr. (Dkt. No. 48) at 106-07) Given that Kromah had been working in New York City as a livery cab driver since 2012 (Trial Tr. (Dkt. No. 46) at 22), there is no reason to distrust his testimony on these points. Kromah also testified that, although he sometimes gets "dizzy spells" and blurry vision, he was "seeing clear" the night of the incident involving Defendant. (Trial Tr. (Dkt. No. 48) at 112-13, 134-35)

As to alleged inconsistencies in Kromah's testimony, he was very clear in describing how Defendant pointed a gun at him and demanded that he drive to a second location. See Trial Tr. (Dkt. No. 46) at 33-34. Through a Mandingo interpreter, Kromah testified that the "[Defendant] said if I don't go [to 137th and St. Ann's Avenue], he going to shoot me with [a] gun. . . . He [then] point[ed] the gun at me." (Id. at 33-34) Kromah then repeated his account in

17

English: "[Defendant] said, I go to 137, St. Anns. I say, I don't want to go there. He said, if you

don't go there, I going to kill you."[7] (Id. at 35) Moreover, Defendant's possession of a firearm

---

[7] The clarity of Kromah's account concerning this exchange stands in sharp contrast to his
testimony concerning the alleged Hobbs Act robbery. Although the prosecutor asked Kromah
numerous times "what . . . the man with the gun [said] about money," Kromah's testimony on
this point was garbled and equivocal:

Q.      What did the man with the gun say about money, how did he say that in English?

A.      (In English) I said, I don't have the money.

Q.      What did he ask you?

A.      (In English) He asked me money. I said I don't have no money.
. . . .

Q.      . . . .Now, using the interpreter . . . what, if anything did the man say about the
        money when he pointed the gun at you?

A.      He said, You don't have money?

Q.      What did the man with the gun say?

A.      After that he never say anything.

Q.      . . . .What did the man say to you about money, and then what did you say to the
        man about money, if anything?

A.      I said, I don't have money.
. . . .

Q.      . . . . In English, what did the man with the gun say?

A.      (In English) He told me, he said he want to kill me. So after that he said, Oh, you
        don't have the money? That's what he said.
. . . .

Q.      . . . Did you give any money to the man that was holding the gun to you?

A.      No.

Q.      Why didn't you give him any money?

18

was established through the testimony of both Kromah and Officer Azcona, who seized the firearm from Defendant at the time of his arrest. (Trial Tr. (Dkt. No. 46) at 34-35; Trial Tr. (Dkt. No. 48) at 159)  There is no evidence suggesting that the gun belonged to someone other than Defendant.  In any event, in pleading guilty, Defendant admitted that he possessed a firearm on October 19, 2013.  (Plea Tr. (Dkt. No. 71) at 15)

Kromah's behavior was also consistent with that of someone who had been threatened at gunpoint.  Kromah testified that he drove to the second location – 137th Street and St. Ann's Avenue – and "slow[ed] down [at that location] . . . in order for [him] to see some police officers, because [he] know[s] police officers [are] always around there."  (Trial Tr. (Dkt. No. 46) at 40-41)  Kromah also testified that he "knew that there is a police station at 138 Street and St. Anns," but that he did not stop his car at the police station because "if [he] [had] stopped there [Defendant] would know that [Kromah] [was] looking for police and it could [have been] risky on [Kromah's] part."  (Trial Tr. (Dkt. No. 48) at 122)  Kromah testified that he "looked around [when he passed the police station] but [he] [did not] [see] any police officer" there, so he continued to 137th Street and St. Ann's Avenue, where he knew he could find a police officer.  (Id. at 121-23)

Finally, Kromah's record of TLC violations and traffic citations, his failure to activate the video recording device in his car, and his failure to arrange for the car's audio

A.     He never insisted on that.  If he insist on it, I would give it to him.

See Trial Tr. (Dkt. No. 46) at 36-39.  Given this garbled and equivocal testimony concerning the alleged Hobbs Act robbery, it is not surprising that the jury concluded that the Government had not demonstrated Defendant's guilt beyond a reasonable doubt.  This finding does not undermine this Court's conclusion that felony coercion was established by a preponderance of the evidence, however.  Kromah's testimony making out the crime of coercion was neither garbled nor equivocal.

19

recording to be provided to the police do not undermine his clear testimony that Defendant pointed a gun at him and demanded that Kromah drive him to a second location. While Defendant argues that the presence of a recording device inside the livery cab makes it unlikely that he would commit a violent crime in the livery cab, there is no evidence that Defendant was aware of this device.

Defendant argues, however, that even if this Court accepts Kromah's account, his testimony "does not establish facts that meet the elements of state felony coercion." (Def. Second Supp. Sent. Ltr. (Dkt. No. 81) at 11) As discussed above, to find that Defendant committed felony coercion, this Court must find – by a preponderance of the evidence – that Defendant "compel[led] or induce[d] [Kromah] to engage in conduct which [Kromah] has a legal right to abstain from engaging in, or to abstain from engaging in conduct in which [Kromah] has a legal right to engage," by "instilling in [Kromah] a fear that [Defendant] . . . [would] cause physical injury to [Kromah] or cause damage to property." N.Y. Penal Law §§ 135.60, 135.65(1).

Although Defendant contends that the "testimony about a direct threat of harm in exchange for a ride was very unclear" (Def. Second Supp. Sent. Ltr. (Dkt. No. 81) at 11-12), there was nothing unclear on this point. Through an interpreter, Kromah testified: "[Defendant] said if I don't go [to 137th and St. Ann's Avenue], he going to shoot me with a gun. . . . He [then] point[ed] the gun at me." (Trial Tr. (Dkt. No. 46) at 34) In English, Kromah testified that "[Defendant] said, I go to 137, St. Anns. I say, I don't want to go there. He said, if you don't go there, I going to kill you." (Id. at 35) In sum, Kromah's testimony very clearly sets forth that Defendant explicitly threatened him with harm if Kromah refused to drive the Defendant to the second location.

Defendant also contends that "a licensed livery cab driver does not have a 'legal' right to refuse to take a passenger to [his] requested destination, or to refuse to take [him] to more than one stop. To the contrary, livery cab drivers are required by law to transport passengers as requested." (Def. Second Supp. Sent. Ltr. (Dkt. No. 81) at 12 (citing 35 R.C.N.Y. §§ 54-16, 54-20(a)). The law cited by Defendant – Chapter 54 of Title 35 of the Rules of the City of New York ("Rules") – applies to Drivers of Taxicabs and Street Hail Liveries. See 35 R.C.N.Y. § 54. The Rules define "Taxicab" as "a motor vehicle, yellow in color, bearing a Medallion indicating that it is licensed by the Commission to carry up to five passengers for hire and authorized to accept hails from persons in the street." 35 R.C.N.Y. § 51-03. "Street Hail Livery" is defined as "a Commission-licensed For-Hire Vehicle . . . that is authorized to accept persons by hail in the street in the Hail Service Zone," which "must be affiliated with a Street Hail Livery Base." 35 R.C.N.Y. § 51-03. Section 54-16(b) states, in part: "Passengers may ask the Taxi Driver or Street Hail Livery Driver on a Hail Trip to change their destination or end their ride during the trip. Drivers must comply with these requests unless it is impossible or unsafe." 35 R.C.N.Y. § 54-16(b). Section 54-20(a) states, in part: "A Driver must not refuse by words, gestures or any other means, to take a Passenger   . . . to any destination within the City of New York, the counties of Westchester or Nassau, or Newark Airport." 35 R.C.N.Y. § 54-20(a)(1).

Although these rules require a taxi or street hail livery driver to comply with a passenger's request to be taken to a different destination than originally specified, Kromah testified at trial that he has a "for-hire [TLC] license." (Trial Tr. (Dkt. No. 48) at 95)  The Rules define a "For-Hire Vehicle" as "a motor Vehicle licensed by the Commission to carry Passengers for-hire in the City [of New York], which[] (1) [h]as a seating capacity of 20 or fewer

21

passengers[;] (2) [h]as three or more doors; [and] (3) [i]s not a Taxicab, a Commuter Van, or an authorized bus as defined by [New York State] Law." 35 R.C.N.Y. § 51-03. A "For-Hire Driver is the Driver of a For-Hire Vehicle." Id. Chapter 55 of Title 35 of the Rules applies to For-Hire Drivers. 35 R.C.N.Y. § 55. Unlike Chapter 54 – which applies to Taxi and Street Hail Livery Drivers – Chapter 55 does not contain a provision requiring For-Hire Drivers to comply with a passenger's demand to change his destination. See 35 R.C.N.Y. § 55-16. Although Kromah was improperly operating as a street-hail driver on the night in question – i.e., Defendant hailed Kromah's car from the street, and did not pre-arrange the trip – nothing in the Rules states that a driver with a for-hire license must comply with the rules pertaining to drivers of street-hail vehicles if he illegally picks up a passenger hailing him from the street. [8]

---

[8] Pursuant to Section 55-28 of the Rules, the "holder of a Valid For-Hire Driver's license . . . is authorized to drive a Street Hail Livery subject to all the requirements of this Section and Chapter 54 of [the] Rules. . . . The holder of a Valid For-Hire Driver's License must comply with all requirements of Chapter 54 while operating a Street Hail Livery." 35 R.C.N.Y. § 55-28(a), (c). Nothing in the record suggests that Kromah was operating a Street Hail Livery, however. With respect to whether he was authorized to pick up passengers who hailed him from the street, Kromah testified as follows:

Q. Now, you have a for-hire TLC license, right?

A. Yes.

Q. And with that license, you are not supposed to pick people up off the street, right?

A. I can do.

Q. Isn't it against the law for someone with a for-hire license to have street pick-ups?

A. I do. I take people.

Q. You do it but it's illegal, right?

A. Everybody do. I do.

(Trial Tr. (Dkt. No. 48) at 95) While this testimony indicates that Kromah picked up customers who hailed him from the street, it does not establish that he was authorized to do so, or that he was operating a Street Hail Livery when he picked up Defendant. Accordingly, this Court finds that Chapter 55 of the Rules – which governs For-Hire Drivers and Vehicles – applies to Kromah.

22

In any event, even assuming <u>arguendo</u> that Kromah was required to comply with the rules pertaining to drivers of street-hail vehicles, the Rules do not require drivers to comply with <u>all</u> passenger requests; rather, a "Driver must comply with all <u>reasonable</u> and <u>lawful</u> routing requests of the Passenger." 35 R.C.N.Y. § 54-16(a) (emphasis added). A driver is permitted to refuse to transport a passenger where, <u>inter alia</u>, "[t]he Passenger is disorderly or intoxicated." 35 R.C.N.Y. § 54-20(b)(9).

Here, Kromah credibly testified that, after he reached the initial destination requested by Defendant, Defendant "scream[ed] at [him]" and demanded that Kromah "go to 137th Street and St. Anns." (Trial Tr. (Dkt. No. 46) at 34) Kromah testified that "[t]he way [Defendant] said it, the way he demanded . . . to go there forcefully, he made [Kromah] not to agree to go there." (<u>Id.</u>) Defendant then threatened to shoot Kromah if he did not drive to the second location. (<u>Id.</u>) Defendant's screaming and threats constitute "disorderly" conduct that permitted Kromah to refuse service to Defendant. <u>See</u> 35 R.C.N.Y. § 54-20(b)(9). Moreover, such behavior and threats do not constitute "reasonable . . . routing requests" with which Kromah was required to comply. <u>See</u> 35 R.C.N.Y. § 54-16(a).

Because Kromah was not legally required, under the circumstances, to take Defendant to the second destination, Kromah had a "legal right to abstain from" taking Defendant to that destination. <u>See</u> N.Y. Penal Law § 135.60. Moreover, Defendant forced Kromah to drive him to 137th Street and St. Ann's Avenue by "instilling in [Kromah] a fear that [Defendant] . . . [would] cause physical injury to [Kromah]" – <u>i.e.</u>, by pointing a gun at Kromah and telling Kromah that he would shoot him – if he did not comply. <u>See</u> N.Y. Penal Law § 135.65(a). Accordingly, this Court finds, by a preponderance of the evidence, that Defendant committed the crime of Coercion in the First Degree, a felony under New York law.

23

Accordingly, a four-level enhancement to Defendant's base offense level will be imposed pursuant to Section 2K2.1(b)(6)(B).

## IV.    CALCULATION OF APPLICABLE GUIDELINES RANGE

Section 2K2.1 of the Guidelines governs offenses under 18 U.S.C. § 922(g)(1).[9] Defendant sustained two adult felony convictions for crimes of violence – a 2000 first-degree robbery conviction and a 2005 second-degree robbery conviction – prior to committing the instant offense. See PSR ¶ 35. Pursuant to Section 2K2.1(a)(2), the base offense level is 24 if "the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2).

With respect to specific offense characteristics, Defendant's base offense level is increased by two levels, pursuant to Section 2K2.1(b)(4)(A), because the offense involved a stolen firearm. U.S.S.G. § 2K2.1(b)(4)(A). A four-level increase is appropriate, pursuant to Section 2K2.1(b)(6)(B), because Defendant used or possessed a firearm in connection with another felony offense – namely, Coercion in the First Degree, in violation of N.Y. Penal Law § 135.65.

With respect to acceptance of responsibility, this Court will apply a two-level reduction, pursuant to U.S.S.G. § 3E1.1(a), because Defendant has clearly demonstrated acceptance of responsibility for his offense. U.S.S.G. § 3E1.1(a). In accordance with the plea agreement, this Court will also apply an additional one-level reduction, pursuant to Section

---

[9]  Section 1B1.11(a) of the Guidelines provides that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a). Accordingly, this Court has used the 2014 Guidelines Manual in determining Defendant's Guideline range.

24

3E1.1(b), because Defendant timely notified authorities of his intention to enter a guilty plea.[10]
See U.S.S.G. § 3E1.1(b). Accordingly, Defendant's total offense level is 27.

                With respect to Defendant's criminal history, three points are added pursuant to
U.S.S.G. §§ 4A1.1(a), 4A1.2(d)(1), and 4A1.2(e)(1) because Defendant was convicted of
robbery in 2000, was sentenced to 5 years' probation, and was then re-sentenced to one to three
years' imprisonment based on probation violations. U.S.S.G. §§ 4A1.1(a), 4A1.2(d)(1),
4A1.2(e)(1). An additional three points are added pursuant to U.S.S.G. §§ 4A1.1(a) and
4A1.2(e)(1) because Defendant was convicted of second-degree robbery and sentenced to six
years' imprisonment in 2005. U.S.S.G. §§ 4A1.1(a) , 4A1.2(e)(1). Two points are also added
pursuant to Section 4A1.1(d) because Defendant committed the instant offense while under a
criminal justice sentence for the 2005 robbery conviction. U.S.S.G. § 4A1.1(d). Accordingly,
Defendant's total criminal history score is eight, which correlates with Criminal History
Category IV. See Sentencing Table, Ch. 5, Part A.

                Offense level 27 and Criminal History Category IV result in a Guidelines range of
100 to 125 months' imprisonment.

---

[10] Application Note 6 to Section 3E1.1 states that, "[i]n general, the conduct qualifying for a
decrease in offense level under subsection (b) will occur particularly early in the case." U.S.S.G.
§ 3E1.1 cmt. n.6. Given that Defendant's guilty plea came after a full trial, it is doubtful that he
qualifies for this additional one-level reduction. However, "[b]ecause the Government is in the
best position to determine whether the defendant has assisted authorities in a manner that avoids
preparing for trial," and because Defendant pleaded guilty "at a sufficiently early point in the
process so that the government . . . avoid[ed] preparing for trial and the court [was able to]
schedule its calendar efficiently," this Court will grant the Government's motion for a one-level
reduction under Section 3E1.1(b). See id.; Plea Agmt. (Dkt. No. 95) at 2.

## CONCLUSION

For the reasons stated above, Defendant's Guidelines range is 100 to 125 months'

imprisonment. Sentencing will proceed as scheduled on July 29, 2015, at 2:30 p.m.

Dated: New York, New York
      July 28, 2015

SO ORDERED.

Paul G. Gardephe
United States District Judge

26